AO 106 (Rev. 04/10) Application for a Search Warrant    AUTHORIZED AND APPROVED/DATE:

# UNITED STATES DISTRICT COURT

**FILED**

for the

MAR 2 2 2024

Western District of Oklahoma

CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIS. OKLA.
BY_____,DEPUTY

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Premises known as 21845 Lilly Dr., Tecumseh, Oklahoma 74873, surrounding curtilage, and any vehicles, garages, and outbuildings thereon

)
)
)
)
)
)
)

Case No. M-24-249    -STE

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

Located in the Western District of Oklahoma, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 846 | Drug Conspiracy |
| 21 U.S.C. § 841 | Distribution of a Controlled Substance |

The application is based on these facts:

See attached Affidavit of FBI Task Force Officer Harrison Fincham

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:(_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Harrison Fincham, FBI Task Force Officer
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/22/24

_____
*Judge's signature*

City and state:  Oklahoma City, Oklahoma

SHON T. ERWIN, United States Magistrate Judge
*Printed name and title*

## WESTERN DISTRICT OF OKLAHOMA
## OKLAHOMA CITY, OKLAHOMA

STATE OF OKLAHOMA     )
                         )
COUNTY OF OKLAHOMA   )

### AFFIDAVIT

I, Harrison Fincham, Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI), having been duly sworn, depose and state as follows:

1.     I have been a Task Force Officer with the FBI since August 2021 and an Oklahoma City Police Officer since January of 2008. I am currently assigned to the Oklahoma City Division, where I am assigned to the Criminal Enterprise Squad, which is responsible for investigating, among other things, the unlawful distribution of narcotics in violation of 21 U.S.C. §§ 841(a)(1) and 846. Through my training and experience, I have become familiar with the methods and operation of drug distributors, including their common organizational structures, use of violence, methods of manufacturing, distributing, storing, and transporting drugs, and methods of collecting and laundering drug proceeds. As part of my investigative experience as a detective and TFO, I have executed search and arrest warrants, conducted physical surveillance, coordinated controlled purchases with confidential sources, analyzed records documenting the purchase and sale of illegal drugs, and spoken with informants and subjects, as well as other local and federal law enforcement officers, regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs.

2.     The facts set forth below are based upon my own personal observations, reports

1

and information provided to me, other documents obtained during the course of this investigation. All of the below-described dates and times are approximate.

3.      The information contained in this Affidavit is submitted for the limited purpose of establishing probable cause to secure a search warrant for 21845 Lilly Dr., Tecumseh, Oklahoma 74873 (the **Subject Property**), as described further in **Attachment A** (physical description), to include the surrounding curtilage and any vehicles, garages, or outbuildings located thereon, for evidence of violations of 21 U.S.C. § 841(a)(1) (manufacturing, possessing, distributing and selling of controlled substances) and 21 U.S.C. § 846 (drug conspiracy), as described further in **Attachment B** (description of items to be seized). Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause for the requested warrant.

## BACKGROUND REGARDING DRUG CASES

4.      As discussed previously, based on my training, experience, and consultation with other seasoned drug investigators, I am familiar with the *modus operandi* of drug traffickers. Based on my training and experience, as well as my participation in numerous drug-related investigations, I know the following:

a)      I am aware that drug dealers frequently keep assets, records, and documents related to their drug distribution organizations, and monies derived from the sale of illegal drugs, in their own residences, businesses, as well as in safe houses where they are not easily detectable by law enforcement officials conducting investigations. Further, I am aware that these individuals will frequently maintain these houses in the

2

name of other individuals, also to avoid detection by law enforcement agencies. I am also aware converting liquid methamphetamine (meth) into crystal form often requires a clandestine laboratory (lab). I know that often times, drug trafficking organizations will use rural properties to house their methamphetamine conversion labs, as rural properties offer more privacy and often provide more seclusion from law enforcement surveillance and inquiring neighbors;

b)     I am aware that even though relevant assets, telephones, and properties are often held in alias or third-party names, drug dealers continue to use and exercise dominion and control over them;

c)     I am aware that drug dealers often maintain on-hand quantities of currency and drugs in order to finance their ongoing drug business;

d)     I am aware that drug dealers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale and distribution of controlled substances, even though such documents may be in code. It is particularly common that individuals engaged in drug trafficking will keep ledgers related to their illegal activity because drug dealers commonly "front" drugs (provide controlled substances on consignment) to their clients, and are frequently "fronted" drugs by their own sources of supply as part of their dealing operations;

e)     I am aware that the aforementioned books, records, receipts, notes, ledgers, etc., are commonly maintained where the drug dealers have ready access to them, *i.e.*, homes, automobiles, businesses and safe houses;

f)     I am aware that drug dealers will frequently keep records, notes, ledgers, contact

lists, and other evidence of their drug trafficking on digital devices (*i.e.,* cellphones, computers, tablets, etc.) and that they often keep such digital devices, particularly cellphones, on their person or on the premises that they control. Further, I am aware that drug dealers will often have multiple digital devices and will frequently use more than one digital device to help conduct their drug trafficking. I am also aware that drug dealers will use these digital devices to further their drug trafficking through the use of digital communication, including, but not limited to, e-mail, calls, and instant messaging. Further, I am aware that drug dealers will attempt to conceal the information on their digital devices that is relevant to their criminal activities through the use of encrypted applications (*i.e.,* WhatsApp, Signal, Silent Phone) and security locks on their devices;

g)      I am aware that it is common for drug dealers to conceal contraband, proceeds of drug sales, and records of drug transactions, drug sources and drug customers, in secure locations within residences, garages, storage building, safes, and safety deposit boxes for ready access, and also to conceal such items from law enforcement agencies;

h)      I am aware that when drug dealers acquire large sums of proceeds from the sale of drugs, they attempt to legitimize their profits;

i)      I am aware that to accomplish these goals, drug dealers utilize, among other things, banks and their attendant services, securities, cashier checks, money drafts, letters of credit, brokerage houses, real estate companies, shell corporations, and business fronts;

j)      I am aware that drug dealers commonly maintain addresses or telephone

4

numbers in books or papers which reflect names, addresses, and/or telephone numbers for their associates in the drug dealer's organization, even if said items may be in code;

k)    I am aware that drug dealers commonly take photographs (or cause photographs to be taken) of themselves, their associates, their property and their products, and that these dealers usually maintain these photographs in their possession and at their residence;

l)    I am aware that firearms are commonly used by drug dealers to protect their inventory and currency; and

m)    I am aware that drug dealers that work at a clandestine meth lab will often keep materials associated with the manufacturing of meth at said location (*i.e.,* chemicals such as Acetone, full and used propane tanks, large cooking utensils, pots, pumps, hoses, sifters, drying racks, personal protective equipment, etc.).

## PROBABLE CAUSE

5.    Law enforcement first became aware of Oscar Hernandez (Hernandez) and the drug trafficking organization (the "DTO") described herein in 2018 during an investigation targeting the Irish Mob Gang ("IMG"), an Oklahoma prison gang that was trafficking drugs across the state of Oklahoma and beyond. During the investigation, which utilized Title III wiretaps, law enforcement intercepted Hernandez and identified him as one of the IMG's principal sources of supply of methamphetamine. These IMG members and their associates were ultimately indicted and convicted. *See United States v. Velasquez*, CR-18-260-SLP. Next, from roughly 2019 to 2021, law enforcement began targeting Hernandez's distribution network. During that portion of the investigation ("Phase 1") investigators uncovered a massive

methamphetamine distribution network led by Hernandez.

6.     Phase 1 established that Hernandez, who was residing in San Luis Potosi, Mexico, relied on trusted family members and confidants in Oklahoma to conduct the day-to-day operations of the DTO. Those individuals in Oklahoma distributed thousands of pounds of methamphetamine to customers of the DTO and collected millions of dollars in drug proceeds—all at Hernandez's direction.     Prior to that distribution, the crystal meth was converted from its liquid form at multiple clandestine laboratories in rural Oklahoma. While these labs were owned by Hernandez's family members and co-conspirators, the individuals that worked at the labs (hereafter referred to as the "lab workers") appeared to report to the ultimate source of supply, whom cooperators identified as "Mamisan". Law enforcement also found evidence indicating "Mamisan" was the individual responsible for coordinating the shipments of liquid methamphetamine from Mexico to Oklahoma; the investigation established that the methamphetamine was being transported in the fuel tanks of a semi-truck, which was owned by and registered to a company called DGC Express. DGC Express, in turn, listed its registered agent as Nelly Gutierrez (Nelly), according to the Texas office of the comptroller. Once the semi-truck arrived in Oklahoma, it was received by the lab workers at a private location, where the liquid methamphetamine could be extracted, placed into transportable containers, and ultimately taken to the clandestine lab location for conversion.

7.     As a result of Phase 1 of the investigation, federal charges were filed in the Western District of Oklahoma against more than forty persons, including Hernandez (*see United States v. Hernandez*, CR-21-76-SLP), members of his incarcerated customer base (*see United States v. Baswell*, CR-21-77-SLP), and two truck drivers (*see United States v. Cedillo*,

CR-21-288-SLP, and *United States v. Lucio*, CR-21-289-SLP). In addition, law enforcement executed over a dozen search warrants, including at the liquid methamphetamine delivery location and two clandestine labs used by the DTO. Law enforcement also made significant drug and money seizures, including over one thousand pounds of methamphetamine and more than $1 million in U.S. currency. At the time, this coordinated effort significantly disrupted Hernandez's and the overall DTO's operation. It was not until the fall of 2022, however—with the help of a newly developed confidential human source (CS1)[1]—that law enforcement launched the second phase of the investigation into the DTO described herein.

8.      Since phase two of the investigation launched, law enforcement has identified new members of this DTO involved in the transportation, conversion, and distribution of large quantities of methamphetamine in Texas and Oklahoma. Law enforcement identified the DTO's main Oklahoma-City-based distributor as Ray David Lara (Lara) after it conducted a controlled buy with Lara for one kilogram of methamphetamine in April 2023. Subsequent surveillance of Lara identified additional co-conspirators, such as Adrian Perez (Perez) and Hector Quinonez Reyes (Quinonez), as well as a warehouse at 701 SE 29th St., Oklahoma City

---

[1]      CS1 was arrested by law enforcement for drug related crimes. CS1 thereafter agreed to assist law enforcement and began providing information relating to this investigation in the fall of 2022. Prior to this last arrest, CS1 had been convicted of drug related crimes in 1998 (manufacturing), 2007 (trafficking), and 2021 (possession). CS1 furnished information to law enforcement in hopes of receiving consideration for his/her most recent pending charges. CS1 has also received $1,000 in monetary compensation to date for his/her cooperation. The information provided by CS1 has been corroborated through other investigative techniques including physical surveillance, consensually recorded conversations, and telephone analysis. Information provided by CS1 has been reliable and I am unaware of any knowingly false information furnished by CS1. Information attributed to CS1 herein, unless otherwise noted, was obtained by CS1 through his/her personal observations or conversations with targets of this investigation and their associates.

(the "29th St. Shop"). Law enforcement also identified one of the DTO's methamphetamine conversion laboratories, which was located at 980801 S Stage Coach Drive, Wellston (the "Wellston Lab"). As discussed below, law enforcement executed a search warrant there on December 8, 2023, recovering more than 1,000 lbs. of liquid and crystal meth and arresting two of the DTO's lab workers, Edgar Rodriguez Ontiveros (Rodriguez) and Jose Equihua (Equihua), on site. For the reasons discussed below, I believe that the **Subject Property** is now serving as the DTO's methamphetamine conversion lab.

9.       Law enforcement has confirmed that the DTO is essentially operating how it was during Phase 1 of the investigation, that is, transporting liquid meth in the gas tanks of semi-trucks to Oklahoma, where members of the DTO extract it and convert it to crystal form at conversion laboratories in rural Oklahoma.

10.       For a time, the DTO was receiving its shipments of liquid meth inside the 29th St. Shop, outside of public view. While the 29th St. Shop was ostensibly operating as a type of auto repair shop, law enforcement has confirmed that this was in fact a front for the warehouse's true purpose: serving as a liquid methamphetamine delivery location for a semi-truck, specifically a black 2015 Cascadia Freightliner bearing Texas tag R65-9752, owned by DARE Express[2] and operated by Michael Estrada (Estrada).[3] Law enforcement observed the black

---

[2]       DARE Express LLC is registered to 1111 Champion Drive, Donna Texas. DARE Express LLC is a Texas based trucking company owned by Dennis Gutierrez (Denis). Law enforcement believes Denis is Nelly's ex-husband, the same Nelly who was the registered agent for DGC Express, the trucking company the DTO was using in 2021.

[3]       Michael Estrada was first identified after surveillance units followed the black semi-truck after delivering to the shop and conducted a traffic stop, during which police identified the driver as Estrada. Court-authorized GPS pings on his cellphone since then,

semi-truck deliver to the 29th St. Shop several times in mid-2023: on May 10, May 21, June 7, July 7, and July 11, 2023.

11.     Each time, the truck stayed for a short amount of time, suggesting to investigators that these too were deliveries of liquid meth.  Law enforcement also observed the black semi-truck make a delivery to 221 SW 29th St., Oklahoma City (the "Car Wash") on September 1, 2023.  That this was a delivery of liquid meth was essentially confirmed in the following days.  After it appeared the DTO members had delivered the liquid meth to the Wellston Lab, Quinonez was observed traveling to and from the lab, leading me to believe that he was transporting converted crystal meth from the lab.  When law enforcement stopped Quinonez in his vehicle on September 6, 2023, he was in possession of 92 kilograms of crystal methamphetamine.

12.     In any event, law enforcement soon received direct confirmation that the deliveries from the black semi-truck inside the 29th St. Shop were liquid meth deliveries.  On September 21, 2023, United States District Judge Jodi W. Dishman for the Western District of Oklahoma, issued two orders—the first authorizing the interception of oral communications inside the 29th St. Shop, and the second authorizing the monitoring and recording of visual, non-verbal conduct inside the warehouse.  Law enforcement monitored activity inside the 29th St. Shop for a total of 87 days.[4]  During that time, law enforcement was able to observe three

_____

in addition to video surveillance, have confirmed that Estrada has continued to use the black semi-truck to deliver liquid methamphetamine to Western District of Oklahoma.

[4]     Law enforcement received two additional bug and/or CCTV authorizations for the 29th St. Shop after this initial round.  First, on October 20, 2023, United States District Judge Scott L. Palk authorized the continued monitoring and recording of visual, non-

deliveries in real time as they occurred on November 10, November 17, and December 6.

13.    On all three occasions, the black semi-truck pulled into the large middle garage

bay of the 29th St. Shop. Once inside, the two lab workers—Rodriguez and Equihua—extracted

the liquid meth from inside the passenger side fuel tank of the black semi-truck into a large IBC

tank housed inside of a black, pull-behind trailer.  DTO members later transported the black,

pull-behind trailer with the meth to the Wellston Lab.

14.    It appears that at the time of the December 6 delivery, the Wellston Lab, a rural,

five-acre property with both a residence and a detached garage, was serving as the DTO's

principal conversion lab.  It was two days after this December 6 delivery at the 29th St. Shop

when law enforcement executed a search warrant at the Wellston Lab, arrested Rodriguez and

Equihua on site, and recovered more than 1,000 lbs. of liquid and crystal meth.[5]

15.    Since the search warrant at the Wellston Lab, it does not appear the DTO has

used the 29th St. Shop to receive another shipment of liquid meth.  This is not to say, however,

that the DTO is not still receiving shipments of meth.  On December 17, 2023, there appears to

have been another delivery.  GPS ping data on Estrada and Lara showed them meeting in the

same area that day, specifically around Newalla and Tecumseh, two rural towns just southeast

of Oklahoma City.  This led law enforcement to suspect that the group had a new liquid meth

---

verbal conduct inside the warehouse.  Then, on November 17, 2023, United States District
Judge Jodi W. Dishman authorized the renewed interception of oral communications and
the continued monitoring and recording of visual, non-verbal conduct inside the same
location on November 17, 2023.

[5]    Field tests on the suspect meth were presumptive positives; official results from the
DEA lab in Dallas are still pending.

delivery location and conversion lab. Further bolstering this belief was law enforcement's observation that Bauilo G. Padilla (Padilla), a suspected distributor for the DTO that appears to have arrived in Oklahoma following Quinonez's arrest, moved the black pull-behind trailer from the 29th St. Shop on December 16. This was significant because the DTO members had previously been observed using the black pull-behind trailer to transport liquid meth from the 29th St. Shop to the Wellston Lab.

16.    After the GPS ping data suggested Estrada and Lara met on December 17, 2023, law enforcement began surveilling the **Subject Property**. The **Subject Property**, another rural property, was not entirely new to investigators, who identified it on June 29, 2023, when GPS ping data on the previous lab workers showed them traveled to this location. Following the December 17 meeting between Estrada and Lara and the observation of two individuals at the **Subject Property** who appeared to be the new lab workers, law enforcement began to suspect this was the DTO's new meth conversion lab.

17.    Since then, there has been additional activity at the **Subject Property** leading me to believe the **Subject Property** is serving as a meth lab. For example, on January 8, 2024[6], law enforcement observed Lara and Perez, in the white Dodge Ram, and Padilla, in his Ford F-150, leave the Car Wash—the site of the September 1 delivery and where Estrada would often drop his trailer before delivering at the 29th St. Shop. Based on what happened next, I believe that Padilla retrieved crystal meth from the lab workers at the **Subject Property** and then

---

[6]    The span of time to receive the shipment until providing a finished product seems to be longer with the newer lab workers. It is reasonable to believe that they needed time to set up the lab and also convert the liquid as their experience level is unknown.

delivered that meth to Lara and Perez.

18.     After the two vehicles departed the Car Wash, law enforcement observed Padilla's F-150 pull into the drive of the **Subject Property**. From here, law enforcement did not have physical surveillance on the F-150, and the F-150 preceded to drive out of view of the surveillance camera. Shortly after, however, the lab workers were observed pulling out of the driveway and towards the same direction as Padilla's F-150 had gone. Padilla then drove to the parking lot of the Grand Casino Hotel & Resort in Shawnee, Oklahoma, where Lara and Perez were waiting. Law enforcement then observed all three travel towards Oklahoma City and arrive at the Car Wash later in the evening. Based on this sequence of events, it appears that Padilla received the crystal methamphetamine at the **Subject Property** from the lab workers off camera and then delivered that crystal meth to Lara and Perez at the casino parking lot, or at the very least, met them there and traveled back in tandem to Oklahoma City. This was similar to how the group was operating when Quinonez was serving as a distributor, with Lara and Perez typically not visiting the Wellston Lab and instead receiving loads of crystal meth from Quinonez somewhere else.

19.     It appears that a similar transfer of crystal meth occurred on January 15, 2024. That evening, law enforcement observed Lara and Perez, again in the Dodge Ram, and Padilla, again in the Ford F-50 leave the Car Wash. Around this time, the lab workers were observed arriving at the **Subject Property**. GPS ping data on Lara's phone showed that he traveled to the area of the **Subject Property**, but it does not appear based on the surveillance camera that he met the lab workers there. The surveillance camera then showed the lab workers leaving the **Subject Property**. Shortly after, Lara's GPS data showed him traveling back to Oklahoma

City, and law enforcement eventually observed the white Dodge Ram and the Ford F-150 travel back to the Car Wash. There, Perez was observed moving a large cardboard box from Lara's White Dodge Ram into Perez's Chevrolet Tahoe. (This was significant because Quinonez, prior to his arrest, had been observed moving cardboard boxes that appeared to come from the Wellston Lab, and when he was arrested with the 92 kilograms of crystal meth, it was in a similar cardboard box.) Perez then left the Car Wash in his Tahoe, and the court-authorized GPS ping on his phone showed Perez traveling to the area of his apartment, located at 1402 SW 59th St., Oklahoma City, where he appears to have stored the cardboard box containing what I believe was crystal meth. Law enforcement was able to follow Perez's GPS pings after the delivery; however, during the two trips to assist in transporting the methamphetamine from the lab it appeared Perez left his phone in Oklahoma City. Based on my training and experience, this is a common tactic to further deter law enforcement from tracking or later finding digital evidence. Law enforcement observed Perez and Lara leaving the Car Wash together, thereby confirming they were travelling together. In sum, my training, experience, and knowledge of the investigation leads me to believe that Padilla traveled to the **Subject Property** to receive crystal meth from the lab workers, and then delivered that meth to Lara and Perez, who then brought it back to his (Perez's) apartment.

20.    Additional details leads me to believe the **Subject Property** is serving as a meth lab. As previously mentioned, following Equihua's and Rodriguez's arrest, law enforcement observed two new individuals at the **Subject Property** who appear to have been sent to replace Equihua and Rodriguez. Those individuals, Marcos Gonzalez and Jorden Gomez, were recently arrested in Washington County, Texas, on drug charges. Gonzalez and Gomez both

have previous drug convictions in Oklahoma state court. All of this further bolsters my belief that the two were visiting the **Subject Property** in order to convert liquid meth.

21.    Following the above events, on February 17, 2024, a subject identified as Jorge Vega arrived and moved into the apartment where Perez had been staying, 1402 SW 59th St., Oklahoma City. That same day, law enforcement observed Perez moving items out of the apartment prior to Vega's arrival. Vega, based on administrative subpoenas and common call analysis, was in contact with a source of supply in Mexico as well as Lara in Oklahoma City. These actions lead law enforcement to believe that Vega has arrived to serve as one of the new lab workers. Vega has also been observed on multiple occasions at another rural location that law enforcement believes to be the new delivery site.[7] Furthermore, on March 13, 2024, based on the court-authorized GPS ping on Vega's phone, he traveled to the area of Dallas, Texas. The next day he traveled back to Oklahoma, specifically to the **Subject Property** and was accompanied by Adan Garcia Miranda (Miranda). This was significant because toll records show that Miranda, in addition to having been in contact with Vega, has been in contact with the suspected source of supply in Mexico. That night of March 14, 2024, Vega and Miranda were observed staying overnight at the **Subject Property**. On March 15, 2024, the two left the **Subject Property** and traveled back to Vega's apartment at 1402 SW 59th St. Miranda was observed on surveillance camera departing the apartment at approximately 7:30 am. All of this—visits to the **Subject Property** and the arrival of Vega and Miranda—lead me to believe,

---

[7]    17500 Midnight Drive Newalla, OK was identified on January 17, 2024, from Lara's GPS pings and physical surveillance in which Lara, Padilla, and the previous lab workers' vehicle was seen. This location was also within the ping radius during the delivery on December 17, 2023.

based on my training, experience, and knowledge of the investigation—that the DTO continues to operate.

22.     In closing, my training, experience, and knowledge of the investigation leads me to believe that the **Subject Property** is currently serving as the DTO's meth conversion lab.  I therefore believe that the **Subject Property**, which is located in Pottawatomie County, Oklahoma, and the therefore the Western District of Oklahoma, will have evidence of the DTO's crimes, including drugs and evidence of drug distribution.

## INFORMATION PERTAINING TO UNLOCKING ELECTRONIC DEVICES WITH BIOMETRIC FEATURES

23.     The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following.

24.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

25.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. If a device is equipped with a facial

recognition feature, a user may enable the ability to unlock the device through his or her face. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face.

26.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

27.     As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

28.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

29.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the **Subject Property** and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

30.     Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the **Subject Property** and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

17

## CONCLUSION

31.    Based on the foregoing, I respectfully submit that there is probable cause to believe that evidence relating to violations of 21 U.S.C. §§ 841(a) and 846 will be found at the **Subject Property**.  I therefore respectfully request issuance of search warrants for the **Subject Property** (as set forth in **Attachment A**) based on the above-mentioned facts.

**FURTHER, YOUR AFFIANT SAYETH NOT.**

Harrison Fincham
Task Force Officer
Federal Bureau of Investigation

Sworn to and subscribed before me this 22nd day of March 2024.

SHON T. ERWIN
United States Magistrate Judge

18

## Attachment A

## ADDRESS TO BE SEARCHED

### (Subject Property)



### Description:

The **Subject Property** is located at 21845 Lilly Drive, Tecumseh, Oklahoma 74873, and is an approximately five-acre property located in Pottawatomie County, Oklahoma. The **Subject Property** appears to be surrounded by a barbed wire fence and a large white metal entry gate. The gravel driveway leads east towards the two main structures on the property, which appear to be a single family home and a metal building.

## Attachment B

## ITEMS TO BE SEIZED

The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (manufacturing, distribution, and/or possession with intent to distribute, controlled substances) and 21 U.S.C. § 846 (conspiracy to do the same), namely:

1.  Illegal controlled substances, and items showing the illegal manufacturing and distribution of controlled substances, including, but not limited to, crystal methamphetamine, liquid methamphetamine, propane tanks, chemicals (i.e. Acetone), pots, personal protective equipment, scales, baggies, hoses, pumps, buckets, drums, or any other equipment/materials used in the manufacturing and packaging of illegal drugs.

2.  Documents, records, or materials related to the distribution of illegal drugs, including, but not limited to: ledgers, address books, telephone books, telephone bills, telephone records, rent receipts, rental car agreements, mini-storage receipts, cellular telephone agreements, pager rental agreements, bills and receipts related to cellular telephones and pagers, and any property and/or U.S. currency being proceeds of or related to the distribution of illegal narcotics. Also ledgers containing quantity of narcotics possessed, ledgers of money owed to the suspects for narcotics they have provided to co-conspirators, ledgers of money owed by the suspects to their suppliers, transportation and distribution instructions for the narcotics being sold, and other types of documentation regarding the sale of narcotics.

3.  Financial documents evidencing the illegal distribution of controlled substances, including, but not limited to: bank statements, bank deposit slips, canceled checks, money orders, money order receipts, wire transfer receipts, stored value cards, handwritten notes depicting monies owed for illegal controlled substances,

documents showing purported income, and any other evidence showing monetary records of the illegal distribution of controlled substances.

4.    Documents, records, or materials related to the laundering of money, including, but not limited to: wire transfer receipts, bank deposit slips, bank withdraw slips, money order receipts, records detailing the purchase of property, items which show control of real property placed in nominee names such as utility payment records, property tax payment records, key to real property, receipts from payment of insurance premiums paid on residences/vehicle.

5.    The fruits and proceeds of the illegal distribution of controlled substances, including, but not limited to: large amounts of currency, financial instruments and other items of value showing the spending of large sums of money made from engaging in the illegal distribution of controlled substances, or other illegal activities.

6.    Any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized, and forensic copies thereof.

a.    With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail

2

contacts, chat and instant messaging logs, photographs, and correspondence;

ii.     evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii.    evidence of the attachment of other devices;

iv.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.     evidence of the times the device was used;

vi.    passwords, encryption keys, and other access devices that may be necessary to access the device;

vii.   applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.  records of or information about Internet Protocol addresses used by the device;

ix.    records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies,

3

"bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

b.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

c.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, cellphones, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

7.   Items which tend to show dominion and control of the property searched, including, but not limited to, utility bills, telephone bills, correspondence, rental agreements, property tax payment records, receipt from the payment of insurance premiums on the residence, and other identification documents.

8.    During the execution of the search of the **Subject Property** described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the **Subject Property** and reasonably believed by law enforcement to be a user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.